**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **VICKIE COOK, Individually and As** | § | |
| **Natural Mother to DEANNA COOK,** | § | |
| **N.W., a Minor, By and** | § | |
| **Through Her Grandparent and** | § | |
| **Guardian VICKIE COOK,** | § | |
| **A.W., a Minor, By and** | § | **CIVIL ACTION NO. _____** |
| **Through Her Grandparent and** | § | |
| **Guardian VICKIE COOK and** | § | |
| **KARLETHA COOK-GUNDY,** | § | |
| **Individually and As Representative of** | § | |
| **the Estate of DEANNA COOK,** | § | |
| **DECEASED** | § | |
| | § | **JURY DEMANDED** |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **T-MOBILE USA, INC.,** | § | |
| **METROPCS COMMUNICATIONS, INC.,** | § | |
| **SAMSUNG ELECTRONICS CO., LTD.,** | § | |
| **SAMSUNG TELECOMMUNICATIONS** | § | |
| **AMERICA, LLC,** | § | |
| **THE CITY OF DALLAS,  and** | § | |
| **ANGELIA HEROD-GRAHAM,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW VICKIE COOK, Individually and as Natural Mother to DEANNA COOK; N.W. and A.W., minors, By and Through their Grandparent and Guardian, VICKIE COOK; and KARLETHA COOK-GUNDY, Individually and as Representative of the Estate of DEANNA COOK, Deceased, Plaintiffs, complaining of the T-MOBILE USA, INC., METROPCS COMMUNICATIONS, INC., SAMSUNG ELECTRONICS CO., LTD.,

SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,   CITY OF DALLAS, TEXAS (the "CITY OF DALLAS"), and ANGELIA HEROD-GRAHAM with this Original Complaint allege as follows:

## I.
## NATURE AND PURPOSE OF THE ACTION

1.      On August 17, 2012, DEANNA COOK, a person known to police to have been involved in, and seemingly escaped, a domestically violent relationship, cried out to the Dallas Police Department for assistance and to save her life.  Ms. Cook died as the 9-1-1 operator and police dispatcher were unable timely to obtain Ms. Cook's home address, leading to a delay in responding to her life-threatening 9-1-1 call.  This delay prohibited police and first responders from timely providing police protection and/or medical attention to Ms. Cook, thus allowing her to die.

2.      Plaintiffs bring this action for negligence, gross negligence, strict liability, etc. relative to wireless location accuracy, particularly in the context of 9-1-1 calls made over cellular phones and wireless technology.

3.      Plaintiffs also bring this action under 42 U.S.C. §§ 1983 and 1988; the Fourteenth Amendment to the United States Constitution; Tex. Civ. Prac. & Rem. Code §§ 71.002 and 71.021 and other constitutional provisions and laws of the United States and the State of Texas, to recover damages for the deprivation under color of law, and in violation of federal law, of the constitutional rights of N.W., A.W., VICKIE COOK; and KARLETHA COOK-GUNDY to assistance and equal treatment under the law.

## II.
## JURISDICTION AND VENUE

4.      This court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 since Plaintiffs are suing for relief under 42 U.S.C. §1983. This Court has jurisdiction over Plaintiffs' other claims under principles of pendent, ancillary and supplemental jurisdiction under 28 U.S.C § 1367.

5.      Venue is appropriate in the United States District Court; Northern District of Texas, Dallas Division, since the city of Dallas is the location of the events made the basis of this cause of action.

## III.
## PARTIES

6.      Plaintiff VICKIE COOK resides in Dallas County, Texas.

7.      Plaintiffs N.W. and A.W. are minors residing in Dallas and bring this action by and through their Grandmother/Guardian VICKIE COOK and KARLETHA COOK-GUNDY, as the Independent Administrator of the Estate of DEANNA COOK.

8.      Plaintiff KARLETHA COOK-GUNDY, who resides in Dallas County, Texas, appears individually and also as the Independent Administrator of the Estate of DEANNA COOK.

9.      Plaintiff KARLETHA COOK-GUNDY resides in Dallas County, Texas.

10.     Defendant the CITY OF DALLAS is a municipality of the State of Texas.

11.     The CITY OF DALLAS funds and operates the City of Dallas Police Department, which, along with the Mayor, Dallas City Manager's office, and Chief of Police is responsible for the implementation of the police department's budget, policies, procedures, practices, customs, domestic violence policies, as well as the acts and omissions, challenged by this suit.

The City of Dallas Police Department is also responsible for preventive, investigative, and enforcement services for all citizens of the CITY OF DALLAS.

12.     Defendant CITY OF DALLAS is also responsible for ensuring that all of its facilities, including the 9-1-1 call center, are in compliance with federal and state law, department or agency policies, rules, and regulations, and related standards of care.  Defendant CITY OF DALLAS is, and/or was, the employer of individual Defendant ANGELIA HEROD-GRAHAM and is responsible for the acts and/or omissions of same that were performed in the course and scope of her employment.

13.     Service of Process may be had on the CITY OF DALLAS by serving its City Secretary, Rosa A. Rios, Dallas City Hall, 1500 Marilla Street, Room 5DS, Dallas, TX 75201-6622.

14.     Service of Process may be had on Defendant ANGELIA HEROD-GRAHAMA by serving her at 1013 Christa Dr., Mesquite, TX  75149.

15.     Defendant T-MOBILE USA, INC. ("T-MOBILE"), upon information and belief, is a corporation organized under the laws of the State of Washington.  T-MOBILE provides wireless voice, messaging and data services in the U.S., Puerto Rico, and the U.S. Virgin Islands. The causes of action set out herein arise from T-MOBILE's contacts with the State of Texas. Service of process upon T-MOBILE may be had by serving its Registered Agent for Service of Process, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

16.     Defendant METROPCS COMMUNICATIONS, INC. ("MetroPCS") provides wireless voice, messaging and data services in the United States. MetroPCS, upon information and belief, is a Delaware corporation with its principal place of business at 2250 Lakeside Blvd., Richardson, Texas 75082. Service of process upon MetroPCS may be had by serving its

Registered Agent for Service of Process, Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

17.     SAMSUNG ELECTRONICS CO., LTD. ("Samsung Electronics") is a global company involved in technology encompassing televisions, smartphones, personal computers, printers, cameras, home appliances, LTE systems, medical devices, semiconductors and LED solutions. The causes of action set out herein arise from Samsung Electronics' contacts with the State of Texas. Service of process upon Samsung Electronics may be had by serving its Registered Agent for Service of Process, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

18.     Defendant SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, ("Samsung Mobile") a Dallas-based subsidiary of SAMSUNG ELECTRONICS CO., LTD., researches, develops and markets wireless handsets, wireless infrastructure and other telecommunications products throughout North America. Service of process upon Samsung Mobile may be had by serving its Registered Agent for Service of Process, Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## IV.
## STATE ACTION

19.     To the extent applicable, Defendants CITY OF DALLAS and ANGELIA HEROD-GRAHAMA were acting under color of state law when they subjected DEANNA COOK and/or Plaintiffs to the wrongs and injuries hereinafter set forth.

**V.**

**ADDITIONAL FACTS PARTICULAR TO PLAINTIFFS' CLAIMS**

20.     On Friday, August 17, 2012, while an intruder was attacking her inside her home, DEANNA COOK, a 32 year-old mother of two, managed to dial 9-1-1 for assistance.

21.     After Ms. Cook's 9-1-1 call initially went into a holding queue, the call was eventually taken by Tonyita Hopkins, who was employed in the 9-1-1 call center of the City of Dallas Police Department's Communications Section.

22.     At the outset of the call, Ms. Cook can be heard screaming at the top of her lungs in fear, crying out for assistance from the 9-1-1 Call Center.

23.     According to an affidavit provided by Tonyita Hopkins, "MetroPCS doesn't always have addresses." Consequently, while precious time elapsed, Ms. Cook's home address, an adequate location for her, and/or call back number information was not immediately provided to the City of Dallas 9-1-1 call center.   Ms. Hopkins asked for assistance from Johnnye Wakefield to help locate the home address for the MetroPCS caller.

24.     Nearly three minutes into the call, Ms. Cook can be heard begging her attacker to stop and asking the attacker why he kicked her door in to gain entry.   The attacker can be heard asking Ms. Cook if she called the police.

25.     Five minutes into the call Ms. Cook can be heard asking her attacker why he is attacking her and stating "please, please stop it."

26.     Approximately seven minutes into the call, Ms. Cook can be heard telling her attacker "please, please, please…..why are you doing this to me." She also screams "help" repeatedly.

27.     From the tone of Ms. Cook's voice and statements that her life was in jeopardy, it was, or should have been, obvious that there was a physical disturbance in Ms. Cook's home and that her life was being threatened.

28.     Despite that it was apparent that Ms. Cook was being threatened, attacked and was in fear for her life, it took nearly ten (10) minutes to finally initiate a "dispatch" request for officers to go to Ms. Cook's southeast Dallas home.  Ms. Cook's 9-1-1 call lasts approximately 11 minutes.

29.     At some point during Ms. Cook's 9-1-1 call, a 9-1-1 operator advised Tonyita Hopkins to disconnect Ms. Cook's call and call her back. Not surprisingly, after doing so, she received Ms. Cook's voicemail.

30.     Nearly 50 minutes after DEANNA COOK's 11-minute 9-1-1 call was placed, and after finally receiving identifying information, Officers finally arrived at Ms. Cook's southeast Dallas house.  The officers looked around the home and left.

31.     Two days later, on August 19, 2012, after Ms. Cook did not show up for church, her daughters N.W. and A.W., mother VICKIE COOK, and sister KARLETHA COOK-GUNDY went to Ms. Cook's residence.

32.     Once at Ms. Cook's home, her family noticed that two of her dogs (who were normally kept inside the house) were outside barking frantically.  Water was leaking from Ms. Cook's garage and other places.

33.     Suspecting foul play, Ms. Cook's mother, VICKIE COOK, called 9-1-1 for assistance after getting no response to knocks on the door or repeated calls to Ms. Cook's METRO-PCS cellular phone.

34.     During a 9-1-1 call from Ms. Cook's mother, Call Taker ANGELIA HEROD-GRAHAM instructed VICKIE COOK that the Dallas Police Department would not send officers to Ms. Cook's home and asked whether Ms. Cook's family had contacted the jails and local hospitals to look for Ms. Cook, although they were reporting that DEANNA COOK was missing.

35.     HEROD-GRAHAM also told VICKIE COOK that Ms. Cook had called on August 17, 2012 to report a domestic disturbance.

36.     HEROD-GRAHAM repeatedly told VICKIE COOK that Ms. Cook would have to call the prisons and hospitals before the CITY OF DALLAS would send police to the home. "I just want officers to help us get in the house," VICKIE COOK pleaded.  "Our police can't help you get into the house," HEROD-GRAHAM responded.

37.     VICKIE COOK continued to beg for help, even telling HEROD-GRAHAM there was water pouring from the home.  HEROD-GRAHAM didn't budge.

38.     ANGELIA HEROD-GRAHAM stated that she was trained by the DALLAS POLICE DEPARTMENT that in instances such as this she should ask the questions she asked Ms. Cook's mother, despite that Ms. Cook's mother was pleading for help locating her missing daughter.   In other words, HEROD-GRAHAM stated that she was following the CITY OF DALLAS's policies and procedures, as she was trained.

39.     After being denied any assistance from the CITY OF DALLAS, Ms. Cook's family began to take matters into their own hands to locate their loved one. Ms. Cook's sister, mother and daughters then went to the rear of her residence, where they kicked the patio door down, and immediately noticed water flowing all throughout the house.

40.     After entering the residence, Ms. Cook's family was nearly overcome by the stench coming from Ms. Cook's bedroom.  They also noticed that Ms. Cook's bedroom door had been kicked in and her home showed clear signs of foul play.

41.     Upon walking into Ms. Cook's bathroom, the family observed Ms. Cook's partially nude body laying side-ways, half-in and half-out of the bathtub, floating atop the cold overflowing water.  Her body was severely discolored and skin abnormally wrinkly.

42.     Immediately upon seeing Ms. Cook's body, her family screamed in shock and agony at finding their loved one in this condition and despite all the pleas for assistance from the police.

43.     Now, more than 12 minutes after her initial 9-1-1 call, DEANNA COOK'S mother spoke to a 9-1-1 operator again and was advised to exit the home.  After the police finally arrived, DEANNA COOK's body was taken directly to the morgue.

44.     Following this incident, Dallas Police Chief David Brown fired HEROD-GRAHAM, alleging that she violated department policy.

45.     Dallas police supervisor Lt. Ben Nabors stated that it is against Dallas Police Department policy to make families call around before sending officers to check on someone.  "I stated that as soon as she [HEROD-GRAHAM] had the relevant information - which occurred quickly in the call - she should have sent police," said Nabors.

46.     However, on February 21, 2013, when HEROD-GRAHAM went before a civil service board to try and get her job back, she stated, "I didn't refuse to send police, I did what I was trained to do."

47.     HEROD-GRAHAM's actions, if taken outside the scope of her employment, constitute negligence and a violation of the constitutional rights of N.W., A.W., VICKIE COOK; and KARLETHA COOK-GUNDY to assistance, protection, and equal treatment under the law.

48.     The City of Dallas' training and pronouncement of policies, which were apparently followed by HEROD-GRAHAM, constitute negligence and a violation of the constitutional rights of N.W., A.W., VICKIE COOK; and KARLETHA COOK-GUNDY to assistance and equal treatment under the law.

### THE TELECOMMUNICATIONS ISSUES

49.     9-1-1 service is statutorily defined as a telecommunications service that provides the user of the public telephone system the ability to reach a Public Safety Answering Point ("PSAP") by dialing the digits 9-1-1.  Citizens rely on 9-1-1 to reach assistance in times of individual crisis or major disaster. The 9-1-1 system is supposed to deliver 9-1-1 calls and location data to the PSAP.

50.     The Texas Legislature created the Commission on State Emergency Communications (CSEC), which is an agency of the State of Texas charged with oversight of the Statewide 9-1-1 system.  The 9-1-1 Program is funded from the fee on each telephone line reflected on an individual's telephone bill (*i.e.* wireline, wireless and VoIP).  The CSEC's role is to preserve and enhance public safety and health in Texas through reliable access to emergency communications services.  The CSEC is also charged with developing minimum performance standards for equipment and operation of 9-1-1 service, recommend minimum training standards, assist in training, and provide assistance in the establishment and operation of 9-1-1 service.

51.     Upon information and belief, the CITY OF DALLAS has been recognized as a municipal emergency communications district pursuant to Health and Safety Code Chapter 772.

Upon further information and belief, the CITY OF DALLAS works with various telecommunications providers to implement the provider's GPS or other location technology.

52.     The city's 9-1-1 call center is located in the basement of Dallas City Hall.  The funding for the center is provided in budgets prepared by the City Manager's office.

53.     According to 9-1-1 operator Tonyita Hopkins, at the time of DEANNA COOK's death there were a series of problems in the 9-1-1 call center "like not having enough call takers, shortage of supervisors, poor quality equipment and lack of communication between the call takers, police dispatchers and police, just to name a few."

54.     At the time of Ms. Cook's death, the CITY OF DALLAS' 9-1-1 call center had inadequate operations, inadequate technology, insufficient staffing, inadequate training, improper disciplinary procedures and unsatisfactory procedures to provide proper handling of 9-1-1 calls in accordance with the goals of the CSEC and reasonable expectations.   The 9-1-1 call center overworked operators, struggled to handle massive numbers of calls and it is not uncommon that incorrect and incomplete information is passed from call takers to police officers in the field.

55.     Chief Brown admits that "there is a need for technological upgrades in the city's 9-1-1 call center."

56.     According to Chief Brown, officers respond to critical calls within "six" minutes. However, it took approximately 50 minutes to respond to Ms. Cook's 9-1-1 cries for help and even after the officers arrived, her call was not treated as a serious call.

**DALLAS'S FINAL POLICY MAKERS AND CHANGES TO THEIR PREVIOUSLY UNCONSTITUTIONAL CUSTOMS AND POLICIES**

57.     Actions taken and public pronouncements by Dallas Mayor Mike Rawlings and Dallas Police Chief David Brown demonstrate that the Mayor and Police Chief, as well as the

Dallas City Council, are final decision-makers and policymakers for many of the customs, practices, policies and procedures complained of herein.

58.     Additionally, recent policy changes made by Mayor Rawlings and Chief Brown establish that the city's previously existing policies, customs and practices violated constitutional rights of its citizens.

59.     For instance, following Ms. Cook's death, Chief Brown changed the police department's customs and policies by adding new call signals so that calls from women  such as Ms. Cook's call can be upgraded quickly, giving patrol officers the green light to drive fast with their lights and sirens and make an emergency entry.

60.     Chief Brown fired HEROD-GRAHAM after Ms. Cook's death, and suspended HOPKINS.  During a February 21, 2013, hearing of the civil service board, Dallas Police Chief David Brown testified that he is the person who decided to fire HEROD-GRAHAM.  Later, Chief Brown stated publicly that he issued COLE a Written Reprimand and reassigned her. Brown also said that he gave the officer who called COLE away from the 9-1-1 call center floor, Lieutenant Ronald Thomasson, an Advice and Instructions reprimand because of the incident.

61.     Chief Brown also moved police sergeants from patrol duty to supervisory roles in the 9-1-1 center.  He moved nearly two dozen patrol officers to the 9-1-1 call center to be trained as operators.  Furthermore, Chief Brown hired additional 9-1-1 operators for the call center to remedy the understaffing that existed on the day Ms. Cook contacted the 9-1-1 center.

62.     In a public announcement, Mayor Mike Rawlings affirmed that he and/or Chief Brown are the final policy makers on staffing and disciplinary policies: "Like all police activity that is immediate, I don't comment on it," he said. "I let the chief kind of look at that, then get back to me with a full report, and that's the right and prudent way to handle it."

63.     Following Ms. Cook's death, Chief Brown started a "lethality assessment" pilot program in which patrol officers ask 11-yes-or-no questions during domestic violence calls to ascertain whether a domestic call is a high-risk situation.  If it is, the officer will explain to the victim that people in such situations have been seriously hurt or killed.  Then the officer will call a domestic violence hotline and urge the victim to speak immediately to a counselor.  "We've actually <u>changed</u> what happens at the scene when we're called to a domestic violence incident," Chief Brown said.  Prior to Ms. Cook's death, the CITY OF DALLAS had a policy and custom of asking no such questions and paying lip service to suspects such as Ms. Cook's domestic abuser, as evidenced by the multiple times the police asked no questions of Ms. Cook when she reported the stalking.  Instead, the police chose simply to shoo the attacker away from her home.

64.     Around the time of Ms. Cook's death, the Dallas Police confirmed several incidents of misplaced paperwork involving family violence cases.  This new report came as the department was in the midst of reviewing a number of other lost file cases, one involving a former detective who reportedly took nearly 2,300 cases home. This time, police say several boxes of investigative cases were found in an unused room.  This is indicative of the disregard with which the police viewed domestic violence cases against women.

65.     In 2012, there were over 4,277 arrest warrants issued in Dallas for suspects in domestic violence cases, but not all suspects were arrested.  Following Ms. Cook's death, Chief Brown stated that he is changing the Police Department's policies and is asking his officers to urge family members, witnesses and victims to reveal more information about whereabouts of suspects.  In or about December 2012, under Chief Brown's direction, the police department launched a special task force of 100 officers to serve arrest warrants.  This was a change in the policy that existed before Ms. Cook's death when the Police Department's clear practices did not

allow it to arrest Ms. Cook's attacker each time she complained of stalking and domestic violence.

66.     On January 14, 2013, Mayor Rawlings stated that the police department would step up efforts to track down and catch known domestic violence abusers, stating "I'm asking Chief [David] Brown today to redouble those efforts," Rawlings said during a news conference at City Hall. "We've got to dial it up to the next level.  That's a lot of people to track down," Rawlings also said, "That's why we've got to redouble our effort to make sure we re-prioritize those [domestic violence suspects] warrants….And I'm asking that these warrants be given the highest priority, along with murders in this city."  This was not the policy beforehand.

67.     Previous to these changes, the police department did not take domestic violence charges seriously, as evidenced by the dozens of times police did not arrest Ms. Cook's attacker despite her complaints.  In fact, during the January 2013 press conference, Mayor Rawlings said the recent rise in fatal domestic violence cases in Dallas is unacceptable.  It was the previous unacceptable customs and policies that fostered the attitude held by Ms. Cook's attacker and other abusers that the CITY OF DALLAS would not take domestic abuse seriously.  This contributed to Ms. Cook's death.  The Mayor, Dallas City Council, City Manager, and Police Chief all had a pivotal role in establishing and maintaining the previously unconstitutional practices and customs that led to the manner in which DEANNA COOK's pre-August 17, 2012 domestic violence complaints were handled and the way VICKIE COOK's 9-1-1 call was handled on August 17, 2012.

**VI.**
**CAUSES OF ACTION**

## COUNT ONE:
## STRICT LIABILITY – T-MOBILE DEFENDANTS

68.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

69.     METROPCS COMMUNICATIONS, INC. and, upon information and belief,  T-MOBILE USA, INC., (collectively, the T-MOBILE Defendants) participated in providing a wireless cellular telephone,  telecommunications technology, and wireless voice, messaging and data services to DEANNA COOK.

70.     DEANNA COOK placed the August 17, 2012, telephone call to the City of Dallas 9-1-1 call center from her MetroPCS cell phone, telephone number 214-962-6737.

71.     According to an affidavit provided by Tonyita Hopkins, "MetroPCS doesn't always have addresses." Consequently, while precious time elapsed, an adequate location and/or call back number information was not immediately provided to the City of Dallas 9-1-1 call center.  In addition, MetroPCS did not provide available technology to DEANNA COOK or the City of Dallas to allow the 9-1-1 call center quickly to locate DEANNA COOK within the accuracies available in other technologies on the market.

72.     The T-MOBILE Defendants are and have been at all times pertinent to this Complaint, engaged in the business of designing, manufacturing, assembling, promoting, advertising, distributing and selling telecommunications technology, wireless PDAs, cellular telephones, wireless voice, messaging and data services such as that used by DEANNA COOK. The T-MOBILE Defendants knew and anticipated that the telecommunications technology and/or mobile device services and products used by DEANNA COOK would be sold to and operated by purchasers, including DEANNA COOK.  The T-MOBILE Defendants also knew that the telecommunications technology and/or mobile device services and products would reach

DEANNA COOK without substantial change in its condition from the time the services and technology and/or mobile device services and products were provided to DEANNA COOK and other users.

73.     The T-MOBILE Defendants designed, manufactured, marketed, assembled, and/or tested the telecommunications technology and/or mobile device services and products to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the telecommunications technology and/or mobile device services and products were defective and unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because of the following design, manufacturing and/or marketing defects, among others:

    a.    The telecommunications technology and/or mobile device services and products were defectively designed because they failed to allow emergency personnel to accurately determine a caller's location;

    b.    The telecommunications technology and/or mobile device services and products were defectively designed because they failed to use readily available GPS tracking technology;

    c.    The telecommunications technology and/or mobile device services and products were defectively designed because they failed to provide a physical address for the 9-1-1 callers;

    d.    The location-finding performance of the telecommunications technology and/or mobile device services and products used by DEANNA COOK were not state-of-the-art;

    e.    The telecommunications technology and/or mobile device services and products were unreasonably dangerous since the T-MOBILE Defendants failed to warn of a foreseeable risk arising from the use of the telecommunications technology and/or mobile device services and products, and lack of adequate warnings or instructions rendered otherwise adequate products unreasonably dangerous;

    f.    The T-MOBILE Defendants failed to conduct proper engineering analysis, failure mode effects analysis, fault tree analysis, design, quality control analysis, root cause analysis, and emerging hazard analysis to evaluate the potential risks, hazard and dangers of the telecommunications technology

and/or mobile device services and products performing inadequately in emergency situations; and

g.   The T-MOBILE Defendants failed to prevent or guard against its telecommunications technology and/or mobile device services and products experiencing location deficiencies by using safer alternative designs that should have used better designed technologies and materials to prevent the catastrophic consequences that occurred here.  The designs could have been provided at little additional cost.

74.   There were no mandatory safety standards or regulatory adopted and promulgated by the federal government or an agency of the federal government that were applicable to the telecommunications technology and/or mobile device services and products at the time of manufacture and development and that governed the product risk that caused this harm.  Alternatively, the design of the telecommunications technology and/or mobile device services and products did not comply with the mandatory safety standards or regulations adopted by the federal or state government that were applicable to the telecommunications technology and/or mobile device services and products at the time of the development or manufacture and that governed the risks that proximately caused the death of DEANNA COOK when the responders did not reach her in the first few minutes.  Additionally, in the alternative, in the event that such standards were in effect, and they were complied with, they were nevertheless inadequate to protect the public from unreasonable risks of injury or danger, or the manufacturer, before or after marketing the telecommunications technology and/or mobile device services and products, withheld or misrepresented the information or material relevant to the federal government's or agencies' determination of the adequacy of the safety standards or regulations at issue.

75.   The defects in the telecommunications technology and/or mobile device services and products could not have been anticipated by a reasonable person, and, therefore presented an unreasonably dangerous situation for expected users such as DEANNA COOK, even when used in a reasonable and foreseeable manner.

76.     The T-MOBILE Defendants should have reasonably foreseen that the dangerous conditions caused by the defective telecommunications technology and/or mobile device services and products would subject DEANNA COOK to harm resulting from the defects.   The T-MOBILE Defendants acted with conscious disregard for the safety of DEANNA COOK, knowing that their conduct created a high and unreasonable risk of serious harm to others and the jury should be permitted to return a verdict of aggravating circumstances damages that will serve to punish Defendants and deter others from like conduct.

77.     DEANNA COOK used the Defendants' telecommunications technology and/or mobile device services and products for its intended purpose and in a reasonable and foreseeable manner.   Nevertheless, Plaintiffs have suffered damages through no fault of their own but as a direct and proximate result of the T-MOBILE Defendants' conduct and/or omissions.

78.     As a proximate result of the actions and omissions of the T-MOBILE Defendants, DEANNA COOK died after suffering severe injuries, damages and property loss, for which Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

<u>COUNT TWO</u>:
**NEGLIGENCE – T-MOBILE DEFENDANTS**

79.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

80.     The Commission on State Emergency Communications ("CSEC") is charged with developing minimum performance standards for equipment and operation of 9-1-1 service, recommend minimum training standards, assist in training, and provide assistance in the establishment and operation of 9-1-1 service.   As a result of the CSEC allowing the T-MOBILE Defendants to provide 9-1-1 capable mobile equipment to Texas residents, T-MOBILE has a duty to 9-1-1 users such as DEANNA COOK, who are taxed for the 9-1-1 services.

81.     The T-MOBILE Defendants had a duty to DEANNA COOK to provide safely designed and manufactured products and technology.   Defendants also had a duty to warn DEANNA COOK of the true nature of the defective nature of the telecommunications technology and/or mobile device services and products.  Defendants failed to fulfill this duty.

82.     According to several testing companies and independent engineering firms, the T-MOBILE Defendants had available to it technology that would have allowed the 9-1-1 operators to locate DEANNA COOK's cell phone within 30 feet or less of her calling location, and to locate her quicker than the several minutes it actually took.   However, the T-MOBILE Defendants made a conscious decision not to make this technology available to the CITY OF DALLAS and DEANNA COOK. Defendants' refusal to provide this technology and information constitutes negligence and gross negligence.

83.     Defendants were negligent and grossly negligent in at least the following respects as it relates to the telecommunications technology and/or mobile device services and products:

    a.    Failing to comply with the statute or regulation designed to protect a class of individuals such as Deanna Cook from being unable to be located by 9-1-1 dispatchers when using a cell phone;

    b.    Designing and distributing telecommunications technology and/or mobile device services and products with a design standard that was intended barely to meet the minimum government regulations, if any, instead of safely designing telecommunications technology and mobile device services and products to reasonably minimize injuries in foreseeable situations;

    c.    Failing to adequately monitor the performance of the telecommunications technology and/or mobile device services and products in the field to ensure that they were reasonably minimizing failures to track a caller's location in an emergency;

    d.    Failing to adequately test the telecommunications technology and/or mobile device services and products to ensure that it would be reasonably safe in foreseeable situations;

e.      Failing to program its services and products to automatically send GPS coordinates to 9-1-1 operators as soon as the call is initiated;

f.      Failing to adequately train the City of Dallas 9-1-1 operators on the standard operating protocol in responding to calls from MetroPCS and T-Mobile callers;

g.      Refusing to use readily available location performance technology that met or exceeded the FCC's 50 meter threshold at 80%;

h.      Failing to adequately upgrade its cell towers;

i.      Failing to design the systems and technology to be able to report to 9-1-1 dispatchers the phone number of a wireless caller and the location of the antenna that receives the call;

j.      Failing to adequately use global positioning satellite data to provide more precise information of where cellular calls are coming from, generally within 30 to 100 meters of the caller's location;

k.      Failing to recall, retrofit, or issue post-sale warnings after the T-MOBILE Defendants knew, or should have known, that the telecommunications technology and/or mobile device services and products and its component parts were defective and unreasonably dangerous;

l.      Failing to monitor its quality control unit suppliers; and

m.      Failing to impose rigorous manufacturing quality control standards on its suppliers.

84.    As a proximate result of Defendants' conduct, DEANNA COOK died after suffering severe injuries, damages and property loss, for which Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

<u>COUNT THREE</u>:
**BREACH OF EXPRESS AND IMPLIED WARRANTIES – T-MOBILE DEFENDANTS**

85.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

86.    The T-MOBILE Defendants breached express warranties that the telecommunications technology and/or mobile device services and products were safe, reliable and that quality was of paramount importance.

87.     The T-MOBILE Defendants also breached the implied warranties of merchantability.  The warranty of merchantability is implied into every commercial transaction. The warranty of merchantability requires that products be of reasonable workmanlike quality and free from defects.  Defendants' impliedly warranted that the telecommunications technology and/or mobile device services and products were of merchantable quality.   The Defendants breached the warranty of merchantability by designing, manufacturing, distributing, selling and refusing to adequately repair or replace their telecommunications technology and/or mobile device services and products after it became apparent they were defective in its ability to locate callers.

88.     At all times, DEANNA COOK relied on representations made by the T-MOBILE Defendants that their telecommunications technology and/or mobile device services and products are reliable and of a quality that rendered them suitable for their intended use, including in emergency situations requiring the caller to be located quickly. DEANNA COOK also relied on Defendants to produce telecommunications technology and/or mobile device services and products of merchantable quality as required by the implied warranty of merchantability.

89.     The T-MOBILE Defendants breached its warranties to DEANNA COOK in that the defective design of their telecommunications technology and/or mobile device services and products renders them unusable for their intended purpose and Defendants refuse to properly repair or replace these items.

90.     As a proximate result of the T-MOBILE Defendants' conduct, which led to DEANNA COOK's untimely death, Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

**COUNT FOUR:**
**DTPA VIOLATION – T-MOBILE DEFENDANTS**

91.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

92.     The T-MOBILE Defendants breached express warranties that their telecommunications technology and/or mobile device services and products contained features that would allow police, fire and other emergency responders easily to find the Cook family.

93.     The T-MOBILE Defendants also violated §§ 17.46(b)(7), (13), (24), inter alia, when it (i) represented that the telecommunications technology and/or mobile device services and products were of a particular standard, quality, or grade, or that it was of a particular style or model, when it was of another; (ii) knowingly made false or misleading statements of fact concerning the telecommunications technology and/or mobile device services and products and the alleged capabilities of its location-finding technology; and (iii) failed to disclose information concerning the outdated and inadequate telecommunications technology and/or mobile device services and products that was known at the time of the transaction since such failure to disclose such information was intended to induce DEANNNA COOK and her family into a transaction into which the family would not have entered had the information been disclosed.

94.     As a proximate result of the T-MOBILE Defendants' conduct, which contributed to the untimely death DEANNA COOK, Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

**COUNT FIVE:**
**MISREPRESENTATION – T-MOBILE DEFENDANTS**

95.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

96.     In various commercials, internet postings, periodicals, press releases, marketing materials and personal conversations etc., the T-MOBILE Defendants have represented that their technology is state of the art and that the safety of their customers is paramount. These representations were intended to, and did, cause consumers such as DEANNA COOK and her family to rely on the T-MOBILE Defendants' representations and purchase telecommunications technology and/or mobile device services and products.  As a result of her reliance on these representations of location accuracy, DEANNA COOK made the decision to use METROPCS and/or T-MOBILE products.

97.     However, as discussed above, the T-MOBILE Defendants made misrepresentations of the quality, reliability and safety of its telecommunications technology and/or mobile device services and products, all to the detriment of DEANNA COOK and Plaintiffs.

98.     As a proximate result of the T-MOBILE Defendants' misrepresentations, which ultimately contributed to DEANNA COOK's untimely death, Plaintiffs are entitled to recover in excess of the minimum jurisdictional limits of this Court.

### COUNT SIX:
### STRICT LIABILITY – SAMSUNG DEFENDANTS

99.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

100.    SAMSUNG   TELECOMMUNICATIONS   AMERICA,   LLC   and,   upon information and belief, SAMSUNG ELECTRONICS CO., LTD (collectively, the SAMSUNG Defendants) participated in providing a wireless cellular telephone, mobile communications and telecommunications technology to DEANNA COOK.

101.     DEANNA COOK placed the August 17, 2012, telephone call to the City of Dallas 9-1-1 call center using her SAMSUNG wireless cellular telephone.

102.     The SAMSUNG Defendants are and have been at all times pertinent to this Complaint, engaged in the business of designing, manufacturing, assembling, promoting, advertising, distributing and selling wireless cellular telephones, mobile communications and telecommunications technology such as that used by DEANNA COOK. The SAMSUNG Defendants knew and anticipated that the wireless cellular telephone, mobile communications and telecommunications technology used by DEANNA COOK would be sold to and operated by purchasers, including DEANNA COOK. The SAMSUNG Defendants also knew that the wireless cellular telephones, mobile communications and telecommunications technology would reach DEANNA COOK without substantial change in its condition from the time the services and technology and/or mobile device services and products were provided to DEANNA COOK and other users.

103.     The SAMSUNG Defendants designed, manufactured, marketed, assembled, and/or tested the wireless cellular telephones, mobile communications and telecommunications technology to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the wireless cellular telephones, mobile communications and telecommunications technology were defective and unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because of the following design, manufacturing and/or marketing defects, among others:

    a.     The wireless cellular telephones, mobile communications and telecommunications technology were defectively designed because they failed to allow emergency personnel to accurately determine a caller's location;

b.      The wireless cellular telephones, mobile communications and telecommunications technology were defectively designed because they failed to use readily available GPS tracking technology;

c.      The wireless cellular telephones, mobile communications and telecommunications technology were defectively designed because they failed to provide an address for 9-1-1 callers;

d.      The location-finding performance of the wireless cellular telephones, mobile communications and telecommunications technology were not state-of-the-art;

e.      The wireless cellular telephones, mobile communications and telecommunications technology were unreasonably dangerous since the SAMSUNG Defendants failed to warn of a foreseeable risk arising from the use of the mobile device services and products, and lack of adequate warnings or instructions rendered otherwise adequate products unreasonably dangerous;

f.      The SAMSUNG Defendants failed to conduct proper engineering analysis, failure mode effects analysis, fault tree analysis, design, quality control analysis, root cause analysis, and emerging hazard analysis to evaluate the potential risks, hazard and dangers of the wireless cellular telephones, mobile communications and telecommunications technology performing inadequately in emergency situations; and

g.      The SAMSUNG Defendants failed to prevent or guard against its wireless cellular telephones, mobile communications and telecommunications technology experiencing location deficiencies by using safer alternative designs that should have used better designed technologies and materials to prevent the catastrophic consequences that occurred here.  The designs could have been provided at little additional cost.

104.    There were no mandatory safety standards or regulatory adopted and promulgated by the federal government or an agency of the federal government that were applicable to the wireless cellular telephones, mobile communications and telecommunications technology at the time of manufacture and development and that governed the product risk that caused this harm. Alternatively, the design of the wireless cellular telephones, mobile communications and telecommunications technology did not comply with the mandatory safety standards or regulations adopted by the federal government that were applicable to the wireless cellular

telephones, mobile communications and telecommunications technology at the time of the development or manufacture and that governed the risks that proximately caused the death of DEANNA COOK.  Additionally, in the alternative, in the event that such standards were in effect, and they were complied with, they were nevertheless inadequate to protect the public from unreasonable risks of injury or danger, or the manufacturer, before or after marketing the wireless cellular telephones, mobile communications and telecommunications technology, withheld or misrepresented the information or material relevant to the federal government's or agencies' determination of the adequacy of the safety standards or regulations at issue.

105.    The defects in the SAMSUNG wireless cellular telephones, mobile communications and telecommunications technology could not have been anticipated by a reasonable person, and, therefore presented an unreasonably dangerous situation for expected users such as DEANNA COOK, even when used in a reasonable and foreseeable manner.

106.    The SAMSUNG Defendants should have reasonably foreseen that the dangerous conditions caused by its defective wireless cellular telephones, mobile communications and telecommunications technology would subject DEANNA COOK to harm resulting from the defects.  The SAMSUNG Defendants acted with conscious disregard for the safety of DEANNA COOK, knowing that their conduct created a high and unreasonable risk of serious harm to others and the jury should be permitted to return a verdict of aggravating circumstances damages that will serve to punish Defendants and deter others from like conduct.

107.    DEANNA COOK used the Defendants' wireless cellular telephones, mobile communications and telecommunications technology for its intended purpose and in a reasonable and foreseeable manner.  Nevertheless, the Plaintiffs have suffered damages through no fault of

their own but as a direct and proximate result of the SAMSUNG Defendants' conduct and/or omissions.

108.     As a proximate result of the actions and omissions of the SAMSUNG Defendants, DEANNA COOK died after suffering severe injuries, damages and property loss, for which Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

## COUNT SEVEN:
## NEGLIGENCE – SAMSUNG DEFENDANTS

109.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

110.     The Commission on State Emergency Communications ("CSEC") is charged with developing minimum performance standards for equipment and operation of 9-1-1 service, recommend minimum training standards, assist in training, and provide assistance in the establishment and operation of 9-1-1 service.  As a result of the CSEC allowing the SAMSUNG Defendants to provide 9-1-1 capable mobile equipment to Texas residents, SAMSUNG has a duty to 9-1-1 users such as DEANNA COOK, who are taxed for the 9-1-1 services.

111.     The SAMSUNG Defendants had a duty to DEANNA COOK to provide safely designed and manufactured products.  Defendants also had a duty to warn DEANNA COOK of the true nature of the defective design of the wireless cellular telephones, mobile communications and telecommunications technology.  Defendants failed to fulfill this duty.

112.     According to several testing companies and independent engineering firms, SAMSUNG had available to it technology that would have allowed the 9-1-1 operators to locate DEANNA COOK's SAMSUNG cell phone within 30 feet or less of her calling location, and to locate her quicker than the several minutes it took.  However, SAMSUNG made a conscious decision not to make this technology available to the City of Dallas and DEANNA COOK.

SAMSUNG's refusal to provide this technology and information constitutes negligence and gross negligence.

113.    Defendants were also grossly negligent in at least the following respects as it relates to the wireless cellular telephones, mobile communications and telecommunications technology:

      a.      Failing to comply with the statute or regulation designed to protect a class of individuals such as Deanna Cook from being unable to be located when using a cell phone;

      b.      Designing and distributing the wireless cellular telephones, mobile communications and telecommunications technology with a design standard that was intended barely to meet the minimum government regulations, if any, instead of safely designing the wireless cellular telephones, mobile communications and telecommunications technology to reasonably minimize injuries in foreseeable situations;

      c.      Failing to adequately monitor the performance of the wireless cellular telephones, mobile communications and telecommunications technology in the field to ensure that they were reasonably minimizing failures to track a caller's location;

      d.      Failing to adequately test the wireless cellular telephones, mobile communications and telecommunications technology to ensure that it would be reasonably safe in foreseeable situations;

      e.      Failing to program its services and products to automatically send GPS coordinates to 9-1-1;

      f.      Failing to adequately train the City of Dallas 9-1-1 operators on the standard operating protocol in responding to calls from SAMSUNG cell phones;

      g.      Refusing to use readily available location performance technology for the SAMSUNG products that met or exceeded the FCC's 50 meter threshold at 80%;

      h.      Failing to adequately upgrade its cell towers;

      i.      Failing to design the systems and technology to be able to report to 911 dispatchers the phone number of a wireless caller and the location of the antenna that receives the call;

j.      Failing to adequately use global positioning satellite data to provide more precise information of where cellular calls are coming from, generally within 30 to 100 meters of the caller's location;

k.      Failing to recall, retrofit, or issue post-sale warnings after the SAMSUNG Defendants knew, or should have known, that the wireless cellular telephones, mobile communications and telecommunications technology and its component parts were defective and unreasonably dangerous;

l.      Failing to monitor its quality control unit suppliers; and

m.     Failing to impose rigorous manufacturing quality control standards on its suppliers.

114.    As a proximate result of SAMSUNG's negligence, DEANNA COOK died after suffering severe injuries, damages and property loss, for which Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

<u>COUNT EIGHT:</u>
**BREACH OF EXPRESS AND IMPLIED WARRANTIES – SAMSUNG DEFENDANTS**

115.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

116.    The SAMSUNG Defendants breached expressed warranties that the wireless cellular telephones, mobile communications and telecommunications technology were safe, reliable and that quality was of paramount importance.

117.    The SAMSUNG Defendants also breached implied warranties. For instance, the warranty of merchantability is implied into every commercial transaction. The warranty of merchantability requires that products be of reasonable workmanlike quality and free from defects. Defendants' impliedly warranted that the wireless cellular telephones, mobile communications and telecommunications technology were of merchantable quality. The Defendants breached the warranty of merchantability by designing, manufacturing, distributing, selling and refusing to adequately repair or replace their wireless cellular telephones, mobile

communications and telecommunications technology after it became apparent they were defective.

118.    At all times, DEANNA COOK relied on the representations made by the SAMSUNG Defendants that their wireless cellular telephones, mobile communications and telecommunications technology are reliable and of a quality that rendered them suitable for their intended use. DEANNA COOK also relied on the fact that Defendants would produce wireless cellular telephones, mobile communications and telecommunications technology of merchantable quality as required by the implied warranty of merchantability.

119.    The SAMSUNG Defendants breached its warranties to DEANNA COOK in that the defective design of their wireless cellular telephones, mobile communications and telecommunications technology renders them unusable for their intended purpose and Defendants refuse to properly repair or replace these items.

120.    As a proximate result of the SAMSUNG Defendants' conduct, which caused DEANNA COOK's untimely death, Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

## COUNT NINE:
## DTPA VIOLATION – SAMSUNG DEFENDANTS

121.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

122.    The SAMSUNG Defendants breached guarantees that their telecommunications technology and/or mobile device services and products contained features that would allow police, fire and other emergency responders easily to find the Cook family.

123.    The SAMSUNG Defendants also violated §§ 17.46(b)(7), (13), (24), inter alia, when it (i) represented that the telecommunications technology and/or mobile device services

and products were of a particular standard, quality, or grade, or that it was of a particular style or model, when it was of another; (ii) knowingly made false or misleading statements of fact concerning the telecommunications technology and/or mobile device services and products and the alleged capabilities of its location-finding technology; and (iii) failed to disclose information concerning the outdated and inadequate telecommunications technology and/or mobile device services and products that was known at the time of the transaction since such failure to disclose such information was intended to induce DEANNNA COOK and her family into a transaction into which the family would not have entered had the information been disclosed.

124.     As a proximate result of the SAMSUNG Defendants' conduct and omissions, which contributed to the untimely death DEANNA COOK, Plaintiffs are entitled to recover in excess of the minimum jurisdictional limits of this Court.

**COUNT TEN:**
**MISREPRESENTATION – SAMSUNG DEFENDANTS**

125.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

126.     In various commercials, internet postings, periodicals, press releases, marketing materials and personal conversations etc., the SAMSUNG Defendants represented that their cellular phones and technology is state of the art and that the safety of their customers is paramount. These representations were intended to, and did, cause consumers such as DEANNA COOK and her family to rely on the SAMSUNG Defendants' representations and purchase telecommunications technology and/or mobile device services and products from SAMSUNG representatives.   As a result of her reliance on these representations of location accuracy, DEANNA COOK made the decision to use SAMSUNG products.

127.   However, as discussed above, the SAMSUNG Defendants made misrepresentations of the quality, reliability and safety of its wireless cellular telephones, mobile communications and telecommunications technology, all to the detriment of DEANNA COOK and Plaintiffs.

128.   As a proximate result of the SAMSUNG Defendants' misrepresentations, which ultimately contributed to DEANNA COOK's untimely death, Plaintiffs are entitled to recover in excess of the minimum jurisdictional limits of this Court.

## COUNT ELEVEN:

### CLAIMS UNDER 42 U.S.C. §1983 AND THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

129.   Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

130.   According to its website, the Dallas Police Department, in serving the people of Dallas, "strives to reduce crime and provide a safe city" by, inter alia, "recognizing that its goal is to help people and provide assistance at every opportunity…and to provide preventive, investigative, and enforcement services."   The website also indicates that Dallas police officers will "[p]erform their duties with the knowledge that protection of the lives and property of all citizens is their primary duty."

131.   The CITY OF DALLAS and HEROD-GRAHAM, acting under color of law and acting pursuant to customs, practices and policies of the CITY OF DALLAS deprived VICKIE COOK, N.W. and A.W., and KARLETHA COOK-GUNDY of their rights and privileges secured to them by the Fourteenth Amendment to the United States Constitution and by other laws of the United States, by failing to provide proper emergency assistance in violation of 42

U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

132.    As discussed above, HEROD-GRAHAM stated during her disciplinary hearing that her actions on August 19, 2012, were consistent with the training she received from the CITY OF DALLAS. Accordingly, the CITY OF DALLAS failed to adequately train HEROD-GRAHAM regarding how to respond to a family's calls regarding locating a family member who has been a domestic violence victim. This failure to train its employees in a relevant respect reflects a deliberate indifference to the rights of the city's inhabitants and is actionable under 42 U.S.C. § 1983.

133.    Implicit in the statements from HEROD-GRAHAM, the CITY OF DALLAS has a policy, practice, or custom of law enforcement that provides less assistance (e.g. by not responding at all or purposefully delaying its response) to calls regarding domestic assault victims than to victims of other assaults.  More specifically, HEROD-GRAHAM stated that the policy she was taught by the CITY OF DALLAS was to have the families of domestic violence victims, such as DEANNA COOK, contact "jails" and hospitals before police would be sent to the residence. This discrimination against women and residents of certain neighborhoods was a motivating factor in the refusal to prioritize and respond quickly to the call from VICKIE COOK.  And the fact that VICKIE COOK, N.W. and A.W., and KARLETHA COOK-GUNDY entered and observed a crime scene was the result of the CITY OF DALLAS' policy, custom, or practice, as well as CITY OF DALLAS' inaction in response to the call.

134.    The CITY OF DALLAS has a policy, practice, or custom of law enforcement that provides less assistance to female victims in high crime and predominantly minority-race neighborhoods than to victims in other neighborhoods. This discrimination was a motivating

factor in the refusal to prioritize and respond quickly to VICKIE COOK's 9-1-1 call and the fact

that VICKIE COOK, N.W. and A.W., and KARLETHA COOK-GUNDY entered and observed

a crime scene was the result of the CITY OF DALLAS' policy, custom, or practice, as well as

their inaction in response to the call.  As further evidence of the policy as to how the CITY OF

DALLAS treats domestic violence issues is the fact that although DEANNA COOK contacted

the Dallas Police Department on multiple occasions to report stalking and domestic violence, the

police department would always simply ask the perpetrator to leave. They did not arrest or

charge the suspect, nor did the police provide Ms. Cook with the information required by Art.

5.04(a).  This was a practice and custom established by the CITY OF DALLAS and followed by

the police officers.  Indeed, HEROD-GRAHAM's actions of trivializing a call about domestic

violence were simply an extension of this custom and policy.

135.    The CITY OF DALLAS and HEROD-GRAHAM responded differently to

VICKIE COOK's 9-1-1 call than if the call had been made by someone similarly situated but of

a non-minority race and/or in a more affluent neighborhood. The CITY OF DALLAS and

HEROD-GRAHAM did not respond to VICKIE COOK's 9-1-1 call timely, or seriously, since

they continually believed this domestic situation in a less affluent neighborhood was less

deserving of their attention. Such conduct is not at all related to any governmental purpose.

136.    In addition, the CITY OF DALLAS, as applicable, failed and refused to

implement customs, policies, practices or procedures, and failed to train its personnel adequately

on the appropriate policies, practices or procedures regarding the handling of 9-1-1 domestic

violence calls from family members. In so doing, the CITY OF DALLAS and HEROD-

GRAHAM knew that they were acting against the clear dictates of current law, and knew that as

a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, family

members observing a loved one's death in a crime scene -- in all reasonable probability would occur.

137.    At the time of VICKIE COOK's call, HEROD-GRAHAM knew that VICKIE COOK was calling from a socioeconomically deprived neighborhood and it was also obvious from listening to VICKIE COOK's voice that she was a minority caller calling about what appeared to be a domestic violence dispute.  Additionally, HEROD-GRAHAM also discovered that DEANNA COOK had made previous calls reporting domestic violence.  In other words, DEANNA COOK and VICKE COOK's racial and socioeconomic classifications factored into the way Defendants handled her 9-1-1 call.

138.    Defendants' actions also demonstrate that VICKIE COOK was the victim of purposeful discrimination, because of her race and/or gender, or due to an irrational or arbitrary state classification unrelated to a legitimate state objective.

139.    Additionally, no rational basis existed for the alleged policies of affording the family of female victims of domestic violence less police protection or assistance than other crime victims or giving these victims less investigative attention than other victims.

140.    Similarly, no rational basis existed for the alleged policies of affording 9-1-1 callers from high-crime areas or predominantly minority areas less police protection or assistance than other crime victims or giving the families of these female victims less investigative attention than other victims.

141.    In addition to the conduct describe above, HEROD-GRAHAM violated VICKIE COOK's rights, *inter alia*, when she failed to prioritize the call from Ms. Cook's family and refused to alert dispatchers of the grave nature of the call.  Treating VICKIE COOK differently

based upon her race and socioeconomic neighborhood constitutes and equal protection violation. The Dallas Police Chief has stated that HEROD-GRAHAM deviated from policy.

142.    Upon information and belief, HEROD-GRAHAM acted independently during some of the conduct or omissions complained of herein and, alternately, within the general scope of her employment during other conduct or inaction.

143.    At the time of the conduct complained of, HEROD-GRAHAM was performing ministerial, not discretionary, duties, the breach of which led to the family entering a crime scene and observing DEANNA COOK in the state in which they found her.

144.    No reasonably competent official would have concluded that the actions of the CITY OF DALLAS and HEROD-GRAHAM described herein would not violate the rights of VICKIE COOK and the other Plaintiffs who were at DEANNA COOK's residence when HEROD-GRAHAM and the other 9-1-1 operators refused to send police in response to VICKIE COOK's plea.  In other words, no reasonably prudent call center employee, supervisor or officer, under similar circumstances, could have believed that HEROD-GRAHAM's conduct was justified.

145.    No rational basis existed for the alleged policy of affording the families of female victims of domestic violence less police assistance than other crime victims.

146.    In addition, Plaintiffs were intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.

147.    In addition to the above actions and inaction, HEROD-GRAHAM failed to prioritize the call from Ms. Cook's family and refused to alert dispatchers of the grave nature of the call, thus causing Ms. Cook's family to enter a crime scene and observe their loved one dead, murdered in her own bathtub.

148.    The CITY OF DALLAS's and HEROD-GRAHAM's conduct described above constitutes gross negligence, recklessness, and/or intentional misconduct.

**COUNT TWELVE:**
**BYSTANDER RECOVERY**

149.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

150.    On August 19, 2012, VICKIE COOK made the call to 9-1-1 and asked that the operator send police to DEANNA COOK's residence to investigate her missing.   HEROD-GRAHAM refused to dispatch police and told the family they would have to contact the local jails and hospitals before the CITY OF DALLAS would send help to the Cook family.

151.    To make matters worse, instead of offering assistance, , HEROD-GRAHAM, informed the family that Ms. Cook had made a 9-1-1 call two days earlier.  This sent the family into an emotional panic.

152.    After repeated pleas for assistance fell on deaf ears, Ms. Cook's family investigated the perimeter of the house themselves and was able to tell that something was wrong.  So, the family kicked the patio door down to gain entry into the residence.  Upon entering Ms. Cook's home, N.W., A.W., VICKIE COOK, and KARLETHA COOK-GUNDY were overcome by the stench coming from Ms. Cook's bedroom.

153.    Upon walking into Ms. Cook's bathroom, N.W., A.W., VICKIE COOK, and KARLETHA COOK-GUNDY observed Ms. Cook's partially clad body laying side-ways, half-in and half-out of the bathtub, floating atop the cold overflowing water.  Her body was severely discolored and skin abnormally wrinkled.

154.    After finding Ms. Cook dead, a 9-1-1 operator overhead Ms. Cook's family screaming in shock and agony at finding their loved one in this condition, despite all the earlier pleas to the police for assistance.

155.    N.W., A.W., VICKIE COOK, and KARLETHA COOK-GUNDY were all located near the bath tub where DEANNA COOK's body was found; their shock resulted from a direct emotional impact upon them from the sensory and contemporaneous observance of the incident; and each is closely related to DEANNA COOK, as her daughters, mother and sister.

156.    More than 12 minutes after her initial 9-1-1 call on August 19, 2012, Ms. Cook's mother spoke to a 9-1-1 operator again whereupon Ms. Cook stated "my baby is in the tub dead." After the police finally arrived, DEANNA COOK's body was taken directly to the morgue.

157.    At the time of VICKIE COOK's call, HEROD-GRAHAM and the other 9-1-1 operators assisting her knew that VICKIE COOK was calling from a socioeconomically deprived neighborhood and it was also obvious from listening to VICKIE COOK's voice for several minutes that she was a minority caller calling about what the 9-1-1 operators knew to be the product of a domestic dispute.  Additionally, HEROD-GRAHAM and the other 9-1-1 operators discovered that Ms. Cook had made previous calls reporting domestic violence. In other words, VICKIE COOK's racial and socioeconomic classifications factored into the way ANGELIA HEROD-GRAHAM and the other 9-1-1 operators handled her 9-1-1 call, as well as the attendant investigation.

158.    N.W., A.W., VICKIE COOK, and KARLETHA COOK-GUNDY all suffered direct injury in form of mental anguish and emotional distress from entering a crime scene (since police wouldn't come out) and witnessing Ms. Cook's dead body after police failed to intervene

to save her life and refused to discover her body, which could have prevented Ms. Cook's family from having to observe the horrific condition of their loved one.

## COUNT THIRTEEN:
### WRONGFUL DEATH

159.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

160.    Plaintiffs bring this wrongful death claim against Defendants pursuant to Texas Civil Practice & Remedies Code sections 71.001-71.012.

161.    Plaintiff VICKIE COOK is a statutory beneficiary of DEANNA COOK and relied on her for love, affection, comfort, financial assistance, protection, affection and care.

162.    Plaintiff VICKIE COOK is also acting as Guardian and Next Friend of minor children Plaintiffs' N.W. AND A.W., both of whom are statutory beneficiaries of DEANNA COOK and relied on her for love, affection, comfort, financial assistance, protection, affection and care.

163.    Plaintiff KARLETHA COOK-GUNDY is the executor/administrator of the Estate of DEANNA COOK.

164.    Defendants' wrongful acts proximately caused the death of DEANNA COOK.

165.    DEANNA COOK would have been entitled to bring an action for her injuries had she lived.

166.    As a proximate result of Defendants' conduct, which caused the untimely death of DEANNA COOK, Plaintiffs are entitled to recover in excess of the minimum jurisdictional limits of this Court.

## COUNT FOURTEEN:

### SURVIVAL ACTION

167.  Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

168.  Plaintiffs bring this survival action against Defendants pursuant to Texas Civil Practice & Remedies Code Sections 71.021-71.022.

169.  Plaintiff KARLETHA COOK-GUNDY is the legal representative of the estate of DEANNA COOK.  Prior to her death, DEANNA COOK had a survival action for herself. KARLETHA COOK-GUNDY is appearing in the survival action as the legal representative of the estate of DEANNA COOK.

170.  Plaintiff VICKIE COOK is a statutory beneficiary of DEANNA COOK and relied on her for love, affection, comfort, financial assistance, protection, affection and care.

171.  Plaintiff VICKIE COOK is also acting as Guardian and Next Friend of minor children Plaintiffs' N.W. AND A.W., both of whom are statutory beneficiaries of DEANNA COOK and relied on her for love, affection, comfort, financial assistance, protection, affection and care.

172.  Defendants' wrongful acts led to DEANNA COOK's death.

173.  As a proximate result of Defendants' conduct, which led to the untimely death of DEANNA COOK, Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court.

## COUNT FIFTEEN:

### DAMAGES– ALL DEFENDANTS

174.  Defendants' acts and/or omissions were a proximate cause of the following injuries suffered by Plaintiffs and decedent:

a.      Actual damages for DEANNA COOK and for N.W., A.W., VICKIE COOK; and KARLETHA COOK-GUNDY individually;

b.      Loss of affection, consortium, comfort, financial assistance, protection, affection and care;

c.      Pain and suffering and mental anguish suffered by DEANNA COOK prior to her death;

d.      Mental anguish, emotional distress, and other damages suffered individually by N.W., A.W., VICKIE COOK; and KARLETHA COOK-GUNDY;

e.      Loss of quality and value of life;

f.      Funeral and burial expenses;

g.      Loss of service;

h.      Loss of earnings and contributions;

i.      Other damages recoverable at law or in equity in actions involving the conduct alleged herein;

j.      Exemplary and punitive damages as well as reasonable attorneys' fees and costs of court;

k.      Pursuant to 42 U.S.C. §1988, and other applicable laws, Plaintiffs should be awarded reasonable attorney's fees for the preparation and trial of this cause of action, and for its appeal, if required;

l.      Prejudgment interest; and

m.      Post judgment interest.

175.     Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

**COUNT SIXTEEN:**
**EXEMPLARY DAMAGES**

176.     Plaintiffs seek exemplary damages for injuries caused by Defendants' gross negligence under Texas Civil Practice & Remedies Code section 41.003(a)(3), as defined by Section 41.001(11).  Plaintiffs also seek exemplary damages for the wrongful death of the decedent caused by Defendants' willful act or omission or gross neglect, as provided in Texas Constitution, article 16, section 26, and Texas Civil Practice & Remedies Code section 71.009.

Finally, Plaintiffs seek exemplary damages under any and all other statutes, acts, or law providing for such damages.

## CONDITIONS PRECEDENT

177.    Defendants have actual notice of DEANNA COOK's death and the other damages and injuries complained of herein.   Any conditions precedent have occurred, been performed, or have been waived.

## DEMAND FOR JURY

178.    Plaintiffs demand a jury trial.

## PRAYER

Wherefore, Premises Considered, Plaintiffs pray that Defendants be cited to appear and answer herein and, upon final trial hereof, that Plaintiffs have and recover from Defendants the Plaintiffs' actual damages, exemplary damages, pre and post-judgment interest, costs of court, attorneys' fees, and such other and further relief, both general and special, at law and in equity, to which they may be justly entitled.

Respectfully Submitted,


/s/ Aubrey "Nick" Pittman
AUBREY "NICK" PITTMAN

THE PITTMAN LAW FIRM, P.C.
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com